**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Case No.  00 RB 2098 (MJW)

KELLY FINCHER, by her natural father and next friend, JAMES FINCHER, on behalf of herself and all others similarly situated,

> Plaintiffs,

v.

PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY,

> Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, & ORDERS**

---

**Blackburn, J.**

On April 4, 2005, this matter came before me for trial to the court on the plaintiff's claim for reformation of an insurance contract.  Previously, I dismissed this case after granting the defendant's motion for summary judgment.  The plaintiff appealed to the United States Court of Appeals for the Tenth Circuit, and the Tenth Circuit reversed.  *Fincher v. Prudential Prop. & Cas. Ins. Co.*, 76 Fed. Appx. 917 (10th Cir. 2003) (unpublished).  The Tenth Circuit held in *Fincher* that the plaintiff is entitled to reformation of the auto insurance policy that is at the heart of this lawsuit.  The Tenth Circuit's remand requires that I establish a date of reformation for the policy, and the terms of the reformation.  Once those issues are resolved, additional issues may remain.  The April 4, 2005, trial concerned only the reformation issues.[1]

---

[1]  I have delayed issuing this order in anticipation of a ruling from the Tenth Circuit in a closely related case, *Clark v. State Farm  Mutual Automobile Insurance Company*, 433 F.3d 703 (2005). The Tenth Circuit issued its order in *Clark* on December 30, 2005.

Having judicially noticed all relevant adjudicative facts in the file and record of this action; having considered the stipulations of the parties; having considered the evidence educed at trial; and having considered the arguments advanced and the authorities cited by the parties during pretrial proceedings and at trial, I enter the following statement of jurisdiction, findings of fact – which are supported by a preponderance of the evidence – conclusions of law, and orders.

## I. JURISDICTION & CONTROLLING LAW

This Court has jurisdiction over this case under 28 U.S.C. § 1332.  This case involves a controversy between citizens of different states, and the amount in controversy exceeds 75,000 dollars, exclusive of costs and interest.  Colorado law controls the resolution of the substantive issues in this diversity case. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Royal Maccabees Life Insurance Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005).

## II. FINDINGS OF FACT

The parties to this case are plaintiff, Kelly Fincher, by her father and next friend, James Fincher, and defendant, Prudential Property and Casualty Insurance Company. At trial the parties presented 74 stipulated exhibits, to which I will refer by their exhibit number.  In addition I heard testimony from live witnesses, and I have reviewed the deposition testimony of four additional witnesses.  In assessing the credibility of each witness who testified at trial or by deposition, I have considered all facts and circumstances shown by the evidence that affect the credibility of the witness, including the following factors: the witness's means of knowledge, ability to observe, and strength of memory; the manner in which the witness might be affected by the outcome of the

2

litigation; the relationship the witness has to either side in the case; and the extent to

which the witness is either supported or contradicted by other witnesses or evidence

presented at trial.  To the extent necessary, I approve, adopt, reiterate, and incorporate

my conclusions of law as findings of fact.

## A.  Summary of Fincher's Claim

This case concerns benefits under an auto insurance policy.  The plaintiff, Kelly

Fincher, was severely injured when she was struck by a car while riding her bicycle.

The accident occurred on May 8, 1994, when Kelly Fincher was 11 years old.  Fincher

suffered a permanent brain injury and will have to live in an assisted living milieu for the

remainder of her life.  The car that struck Kelly Fincher was driven by Anthony

Bekeshkas, who was insured under an auto insurance policy issued by defendant,

Prudential Property and Casualty Insurance Company.  Prudential has paid Fincher

some benefits under the Bekeshkas policy.  In this lawsuit Fincher claims she is entitled

to additional benefits known as additional Personal Injury Protection (APIP) benefits.

When the Bekeshkas policy was issued on April 23, 1992, and at the time of the

accident on May 8, 1994, Colorado law required all Colorado auto insurance policies to

provide a certain minimum level of personal injury protection (PIP) benefits.  The PIP

benefits in the Bekeshkas policy are not at issue here.  Prudential has paid Fincher the

required minimum PIP benefits under the Bekeshkas policy.  In addition, at the time the

Bekeshkas policy was issued and at the time of the accident, Colorado law required

insurers to offer certain optional APIP benefits to their customers.  Bekeshkas was

offered APIP benefits when he purchased his Prudential policy, but that offer provided

for a $150,000 cap on APIP benefits.  At the relevant times, Colorado law provided that

APIP benefits could not be capped at an amount lower than $200,000.  §10-4-710, C.R.S. (1990).  Bekeshkas declined Prudential's offer of APIP benefits with the $150,000 cap.  In *Fincher*, the Tenth Circuit held that Fincher is entitled to reformation of the Bekeshkas policy because Prudential's offer of APIP benefits to Bekeshkas did not comply with the requirements of Colorado law concerning the permissible level of the cap on APIP benefits.  76 Fed. Appx. at 922 - 923.

## B. Development of APIP Statutory Requirements

The Colorado statutes outlining the requirements for PIP and APIP benefits are part of the Colorado Auto Accident Reparations Act, part 7 of article 4 of title 10, C.R.S. (CAARA), repealed by §10-4-726, C.R.S. (2002), effective July 1, 2003.  Although the CAARA now has been repealed, the provisions of the CAARA control Fincher's claims against Prudential.

The CAARA required motor vehicle owners to maintain minimum insurance coverage on their vehicle, including no-fault personal injury protection (PIP).  §10-4-705, C.R.S. (1994).  PIP coverage provided payments for medical expenses, rehabilitation, lost wages, and death benefits.  §10-4-706(1)(b)-(e), C.R.S. (1994).  At the time of Fincher's accident, the minimum coverages included $50,000 per person per accident for medical expenses for bodily injury, $50,000 for rehabilitation expenses, and a maximum of $400 per week for wage loss for 52 weeks following the accident. §10-4-706 (1), C.R.S.  (1994).  Again, it is undisputed that Prudential paid Fincher the minimum PIP benefits provided under §10-4-706, C.R.S. in a timely fashion.

Beginning in 1987, Colorado law required insurance companies to offer additional PIP benefits, or APIP, with each auto insurance policy.  §10-4-710, C.R.S.

At the time Bekeshkas purchased his policy, and at the time of the accident involving

Fincher, § 10-4-710 required Colorado auto insurers to offer APIP benefits that covered

medical expenses and wage losses.  Insurers were permitted, but not required, to put a

monetary cap on APIP benefits.  At the times relevant to this case, any cap on APIP

benefits could not be lower than 200,000 dollars.  §10-4-710(2)(b), C.R.S.   Again,

Prudential offered Bekeshkas APIP benefits when he purchased the Prudential policy,

but the offer provided for a 150,000 dollar cap on such benefits.

Prior to January 1, 1990, the CAARA provided that any cap on APIP benefits

cold not be lower than 100,000 dollars.  Legislation passed in 1989 amended the

CARA.  Effective January 1, 1990, the lowest permissible cap on APIP benefits was

increased from 100,000 dollars to 200,000 dollars.  See §10-4-710, C.R.S. (1990)

(historical note - "The 1989 amendment added subsec. (2)(a)(III), and changed the

dollar amount in subsec. (2)(b) from one to two hundred thousand dollars.").

### C. Prudential's Reaction to the 1990 Change in the APIP Cap

In 1989, Prudential began the project of modifying its policy forms, rules, and

rates to comply with the new 200,000 dollar APIP cap, as well as multiple other

requirements.  Prudential notified its employees and agents to convey orally these new

coverage limits to policyholders both before and after the statute's effective date.  In an

effort to comply with the new requirements, Prudential submitted forms, rules, and rates

to the Colorado Department of Insurance (CDOI) on November 13, 1989, and January

16, 1990.  Ex. 19; Ex. 56, pp. 2, 61.

The policy forms were disapproved by the CDOI on January 24, 1990, not

because the policy coverages or the $200,000 statutory aggregate cap were deficient,

but because the CDOI examiner felt the proposed coverages should be set out separately or unbundled.  Ex. 100, Gibboney Deposition, p. 120; Ex. 9.  After considering whether or not to contest the CDOI examiner's determination, Prudential decided to accept the determination.  In November and December, 1991, Prudential submitted a revised policy form, and revised rules and accompanying rates, including the $200,000 cap.  Ex. 56, pp. 50, 56, 61.  The revised rules were approved, but the revised forms and rates were disapproved for reasons unrelated to the 200,000 dollar cap.  Ex. 56, pp. 58 - 59; Ex. 100, Gibboney Depo., pp. 116 - 119.

While Prudential was finalizing its revised submission to the CDOI, new PIP legislation in 1992 implemented additional changes, once again requiring Prudential to file revised forms, rules, and rates with the CDOI.  While awaiting formal approval of the policy forms and rates, Prudential treated all policies which included APIP benefits as having an aggregate limit of 200,000 dollars in APIP benefits.

Bekeshkas applied for his Prudential policy on April 23, 1992, more than two years after the effective date of the statute prohibiting a cap on APIP benefits of less than 200,000 dollars.   Again, Bekeshkas rejected Prudential's offer of APIP benefits capped at 150,000 dollars, and his policy thus was not treated as an APIP policy when Fincher sought coverage under the policy in May, 1994.

### III. CONCLUSIONS OF LAW

To the extent necessary, I approve, adopt, reiterate, and incorporate my findings of fact as conclusions of law.

### A. Colorado Law Concerning Insurance
### Policy Reformation Under the CAARA

The Colorado Court of Appeals and the Tenth Circuit have held that an insurance policy regulated by the CAARA must be reformed when an insurer fails to offer optional APIP coverages, as required by the CAARA. *Clark v. State Farm Mutual Automobile Insurance Co.*, 319 F.3d 1234, 1242 (10th Cir. 2003); *Brennan v. Farmers Alliance Mutual Insurance Co*, 961 P.2d 550, 553 (Colo. App. 1998); *Thompson v. Budget Rent-A-Car Sys., Inc.*, 940 P.2d 987, 990 (Colo. App. 1996). The holdings in these cases are instructive here.

In *Thompson*, an individual was injured seriously while a passenger in a car rented from Budget. Budget was a self-insurer under Colorado law. The insurance portion of the rental agreement provided that the renter waived supplemental no fault and other optional coverages. *Thompson*, 940 P.2d at 989. In other words, Budget, as an insurer, did not offer APIP benefits, as required by §10-4-710, C.R.S. The driver who had rented the car said that he would have refused the supplemental coverage if it had been offered by Budget.

The Colorado Court of Appeals held that the policy must be reformed to comply with the requirements of Colorado law.

> When an insurer fails to offer the insured optional coverage that it is statutorily required to offer, additional coverage in conformity with the required offer is incorporated into the agreement by operation of law.

* * * *

> Here, because Budget did not offer supplemental no-fault coverage as required by § 10-4-710(2)(a), we conclude that such coverage was automatically incorporated into the agreement.  We further conclude that the driver's after-the-fact statement that he would have refused the additional coverage if it had been offered does not require a different result.

*Thompson*, 940 P.2d at 990.  The *Thompson* court upheld the trial court's reformation of the insurance contract to include APIP benefits.  *Thompson's* holding concerning the reformation of insurance contracts is " applicable to any situation where an insurer has failed to comply with the [CAARA] and offer an insured the extended PIP coverage set forth therein."  *Fincher*, 76 Fed. Appx. at 922.

The *Thompson* court held also that the permissible 200,000 dollar cap on APIP benefits was not applicable to the reformed contract.

> Budget could have included in its rental agreement a provision for a $200,000 cap for all benefits.  It did not do so, however, and therefore, plaintiffs' benefits are not subject to such a limitation.

*Thompson*, 940 P.2d at 991.

In *Brennan*, a pedestrian injured in an auto accident sought APIP benefits form Farmers Alliance, the company that insured the car involved in the accident.  *Brennan v. Farmers Alliance Mutual Insurance Co.*, 961 P.2d 550, 552 (Colo. App. 1998).  Farmers argued that Colorado law did not require that pedestrians be covered by APIP benefits.  The Colorado Court of Appeals held that §10-4-710, C.R.S. required insurers to offer APIP coverage that included pedestrians.  961 P.2d at 554.  Consistent with *Thompson*, the *Brennan* court held that  "additional coverage in conformity with the offer mandated by statute will be incorporated into the policy . . . "  *Id*.  The court reformed the policy to provide APIP coverage that included pedestrians.  *Id*.

The policy at issue in *Brennan* included a cap of 200,000 dollars on APIP benefits, as permitted by the CAARA.  Although the offer of APIP coverage did not comply with the CAARA because coverage of pedestrians was not included, the *Brennan* court concluded that the permissible 200,000 dollar cap was applicable to the reformed policy.  *Id*. at 554 - 555.

*Clark* also involved an auto-pedestrian accident and an insurance policy that excluded pedestrians from APIP benefits.  *Clark v. State Farm Mutual Automobile Insurance Co.*, 319 F.3d 1234, 1243 - 1244 (10th Cir. 2003) (*Clark I*).  In *Clark I* the Tenth Circuit held that Clark was entitled to reformation of the insurance policy, and listed certain factors that are relevant to the equitable determination of the timing and terms of the reformation.  319 F.3d at 1243.  On remand, the trial court examined three major considerations to determine the effective reformation date for the policy: 1) the degree to which reformation from a particular date would upset past practices on which the parties may have relied and whether State Farm anticipated the rule in *Brennan*; 2) how reformation from a particular date would further or retard to purpose of the rule in *Brennan*; and 3) the degree of injustice or hardship that reformation from a particular date would cause the parties.  *Clark v. State Farm Mutual Automobile Insurance Co.*, 292 F.Supp.2d 1252, 1260 - 1268 (D. Colo. 2003) (Babcock, C.J.) (*Clark II).*

Applying these factors, Judge Babcock concluded that the reformation of the insurance policy should be prospective only, and that the date of his reformation order was the most equitable date for reformation of the insurance policy.  *Clark II*, 292 F. Supp.2d at 1268.  Judge Babcock's reformation ruling in *Clark II* was upheld recently

by the Tenth Circuit in *Clark v. State Farm Mutual Automobile Insurance Co.*, 433

F.3d 703 (10th Cir. 2005) (*Clark III*).

Finally, in *Fincher* the Tenth Circuit held that Fincher is entitled to reformation of

the Bekeshkas insurance policy because Prudential failed to comply with the CARA by

offering Bekeskas the APIP coverage options required by Colorado law.  *Fincher*, 76

Fed. Appx. 917, 922 - 923.   The Tenth Circuit's remand requires that I determine the

effective date of reformation, based on the equitable considerations outlined in *Clark II*.

*Id.* at 923.  Those considerations include: 1) the degree to which reformation from a

particular effective date would upset past practices on which the parties may have

relied, and whether Prudential anticipated the rule in *Brennan*; 2) how reformation from

a particular date would further or retard the purpose of the rule in *Brennan*; and 3) the

degree of injustice or hardship reformation from a particular effective date would cause

the parties.  *Id.*  In addition, I must determine whether or not any kind of cap is

applicable to the coverage available to Fincher under the reformed policy.

The Tenth Circuit's opinion mandating reformation of the policy in this case was

issued on October 1, 2003.  In advance of the trial on the reformation issues,

Prudential tendered to Fincher a payment of $92,500.  With that payment Prudential

has paid Fincher a total of $200,000 in PIP and APIP benefits under the Bekeshkas

policy.

### B.  Date of Reformation of the Bekeshkas Policy

I must apply the law outlined above, and the factors specified in *Fincher*, to

determine the effective date of the reformation of the Bekeshkas policy.  *Fincher*, 76

Fed. Appx. at 923.  Again, these factors are the same factors outlined by the Tenth

Circuit in *Clark I.* 319 F.3d at 1243 - 1244.  My decision concerning the effective date of reformation of the Bekeshkas policy is a discretionary and equitable decision based on the particular circumstances of this case.  *Id.* at 1242 - 1243.

In this case the earliest possible reformation date is the date of the accident, May 8, 1994.  In essence, reformation as of that date would indicate that Prudential should have been aware of its obligation to provide offers and policies with an APIP cap no lower than 200,000 dollars, that there was no reasonable basis for Prudential not to have done so, and that other relevant considerations do not weigh in favor of a later reformation date.  The second relevant point in time is the date of the Colorado Court of Appeals' opinion in *Thompson*, September 5, 1996.  That is the date on which Prudential became aware that reformation of an insurance contract is the remedy provided by Colorado law when an insured demonstrates that an insurer's offer of insurance coverage did not comply with the requirements of the CAARA.  A third relevant point in time is the date of the Tenth Circuit's decision in *Fincher*, after which it was clear that the Prudential policy would be reformed to provide APIP benefits to Fincher.  The fourth relevant date is the date of this order.  Of course, the balance of the various factors also might support reformation of the contract at some other date in the span of time between the date of the accident and the date of this order.

> **i.**  The degree to which reformation from a particular effective
> date would upset past practices on which the parties may have
> relied, and whether Prudential anticipated the rule in *Brennan*.

In *Clark II*, Judge Babcock described this factor as requiring consideration of the degree to which a particular reformation date upsets the parties' reliance on past practices and on the law as reasonably understood at the time.  292 F.Supp. 2d at

1261.  If the law established unpredictable new obligations or resolved issues in a way that was not clearly foreshadowed, then reformation from an effective date that preceded the change in the law may

> dramatically upset past practices because the company's reliance would have been more reasonable.  Conversely, a predictable or clearly foreshadowed rule would not upset past practices, as the parties could plan for the rule's consequence.  Underlying this analysis is the obvious concern that any insurer must be able to calculate premiums on an actuarially sound basis so as to sustain its ability to pay future claims.

*Clark II*, 292 F.Supp.2d at 1267.

In *Clark II*, Judge Babcock discussed how *Brennan* affected State Farm's reasonable reliance on the company's understanding that pedestrians need not be included in APIP benefits.  Judge Babcock concluded that State Farm reasonably relied on its understanding of the law before *Brennan*, and that generally State Farm took appropriate action to remedy its non-compliance, prospectively, after *Brennan*.  *Id*. at 1261 - 1265.  Under these circumstances, Judge Babcock concluded that this factor weighed in favor of a reformation after the Tenth Circuit's opinion in *Clark I*, the point in time when State Farm became aware that *Brennan* applied retroactively.  *Clark II*, 292 F.Supp.2d at 1265.

I conclude that Prudential did not anticipate the rule in *Brennan*, and that its failure to anticipate that rule was reasonable.  On this point, I agree with Judge Babcock's analysis in *Clark II*, 292 F. Supp. 2d at 1265.  However, Prudential's inability to anticipate *Brennan* carries little weight in determining an equitable reformation date in this case.  The holding in *Brennan* is not directly relevant to the key flaw in the Prudential policy.  At the relevant times, the Prudential policy included pedestrians in APIP coverage.  Thus, even if Prudential reasonably did not anticipate the *Brennan*

rule, the change wrought by **Brennan** did not upset Prudential's past practices because Prudential had planned for the inclusion of pedestrians in its APIP coverage.

Again, the key flaw in the Prudential offer and  policy was the improper 150,000 dollar cap on APIP benefits.  Again, the CAARA permitted a cap no lower than 200,000 dollars.  This legal requirement was in place more than two years before Bekeshkas purchased his policy and more than four years before the accident.  It is undisputed that Prudential was aware of the change in Colorado law when the amount of the permissible cap on APIP benefits was raised from 100,000 dollars to 200,000 dollars in 1989, and that it continued to be aware of this requirement.  Despite this knowledge, Prudential violated this well known and easily anticipated legal requirement.

Prudential argues that it was unable to modify its forms promptly to include the new 200,000 dollar cap because it was not able to obtain approval of its new forms, rules, and rates from the CDOI.  Prudential notes also that once the permissible cap was raised to 200,000 dollars, it instructed its agents that they should orally inform customers purchasing a policy that APIP benefits were capped at 200,000 dollars, and not 150,000 dollars.  These circumstances, Prudential argues, demonstrate its reliance on the procedures of the CDOI, and its inability to achieve full compliance with Colorado law in implementing the 200,000 dollar cap because of the CDOI's requirements.  According to Prudential, these circumstances augur for a later reformation date.

In 1990, 1991, and until July 1, 1992, Prudential was prohibited from using a policy form until that form was approved by the CDOI.  After July 1, 1992, Colorado began using a self-certification process under which an insurance company could

begin to use a form 31 days after the company certified in writing that the form was compliant with Colorado law.  Ex. 24, Ex. 25.  This new process is referred to as certify and use.  Prudential believed that CDOI approval of rates still was required, and forms that offered specific coverages associated with specific rates could not be used absent approval of the rates.  Ex. 101, Henry Depo., p. 155 - 156.  However, nothing in the record indicates the delay in Prudential's adoption and use of CAARA compliant forms under the certify and use regime was related to the CDOI's disapproval of Prudential's proposed rates.

Between 1990 and 1992, Prudential did face some difficulty in getting the CDOI to approve new forms which reflected an appropriate cap.  I cannot conclude that those difficulties made Prudential's non-compliant offer of APIP coverage to Bekeshkas entirely reasonable, or that Prudential's reliance on CDOI approval justifies the long delay in Prudential's development of compliant offer and policy forms.  First, two years after the effective date of the statute raising the permissible cap to 200,000 dollars, Prudential still was struggling to obtain CDOI approval of its new forms, rules, and rates.  I agree with Fincher's insurance expert, Mike Hodges, that such approval could have been achieved more quickly.  The forms approval process was eased by the CDOI's adoption of its certify and use policy in July, 1992.  Still, Prudential's amended forms, rules, and rates still had not been approved and implemented by the time of the Fincher accident on May 8, 1994.  This delay cannot be blamed solely on the CDOI.  The evidence in the record indicates that Prudential also contributed to the delay simply because it did not pursue this task with adequate vigilance.

During this period of delay, Prudential could have provided its potential insureds with a written notice indicating that the cap on APIP benefits had been raised to 200,000 dollars.  If such a notice had been provided, then there would be a clear record that Bekeshkas was offered APIP benefits in the proper amount.  Prudential's effort to instruct its agents to provide oral notice about the 200,000 dollar cap to potential insureds does not provide any record of the details of the offer made to an insured.  As a result, Prudential's offer of APIP coverage did not comply with Colorado law, and Bekeshkas was not informed in any reliable fashion that APIP coverages could not be lower than 200,000 dollars.

I note that the plaintiff's expert, Mike Hodges, testified that Colorado law did not require that insurance applicants be given a written explanation of APIP benefits until after July 1, 1992.  Eugene Brown, a witness who worked for Prudential at the relevant times, testified that Bekeshkas received at least three renewal notices from Prudential after he applied for the policy in April, 1992, and after this written explanation requirement was in effect.  There is no evidence, however, that Prudential made any effort to notify Bekeshkas that he could select APIP coverage with a cap of 200,000 dollars via these renewal notices or otherwise.  Rather, this known flaw in Prudential's documents remained unaddressed, from Bekeshkas' perspective, until the time of the accident.

The *Thompson* opinion was issued on September 5, 1996.  After *Thompson*, Prudential was or should have been aware that reformation of an insurance policy was the appropriate remedy when an insured was not offered the optional APIP coverages required by the CAARA.  As of September, 1996, Prudential was aware that its offer to

Bekeshkas was not compliant with the APIP provisions of the CAARA, and that reformation of the policy to provide APIP coverage was the proper remedy.

There is no indication that Fincher specifically placed any reliance on these details of Colorado auto insurance law prior to the accident.  After the accident, Fincher obviously relied on Bekeshkas' insurance coverage as a source of compensation for her injuries.  Of course, Fincher could not have placed any reliance on the fact that Bekeshkas carried anything more than the legally mandated level of coverage, which did not include APIP coverage.  However, it is fair to conclude that Fincher reasonably relied on Prudential, and insurance companies generally, to comply with applicable law in offering and providing the coverage available to her under the Bekeshkas policy.

To the extent Prudential's difficulties in getting its forms, rules, and rates approved can be laid at the feet of the CDOI, this bureaucratic hurdle weighs in favor of a later reformation date.  To some extent, CDOI procedures did slow Prudential's compliance efforts.  To the extent Prudential was aware of the requirements of the CAARA, and simply failed to implement those requirements because of Prudential's lack of vigilance, the facts weigh in favor of an earlier reformation date.  On balance, I conclude that this factor weighs in favor of an earlier reformation date.  An earlier date does not upset the parties' past practices or their reasonable reliance on applicable legal rules that were clear and predictable.  The evidence does not support the conclusion that the obstacle presented by the CDOI was so formidable that Prudential could not reasonably have achieved compliance with the new CAARA rule concerning a cap on APIP benefits for over four years.

16

**ii**. How reformation from a particular date would further
or retard the purpose of the rule in ***Brennan.***

This factor is the second factor identified by the Tenth Circuit in both ***Clark II*** and

***Fincher***.  I agree with Judge Babcock's evaluation of how this factor should be applied.

> The purpose of the rule in ***Brennan*** - which was not identified in ***Clark*** or
> ***Brennan*** - is one that is difficult to define.  Indeed, the rule itself is difficult
> to identify as "***Brennan*** ... did not announce a new rule of procedure or
> substantive law."  ***Clark***, 319 F.3d at 1242.

> ***Brennan*** did do two things.   It "construed [the] CAARA to require
> that extended PIP benefits be payable to pedestrians."  ***Id***.  And
> "[b]ecause that coverage was not offered to the insured, the court applied
> the rule established in ***Thompson*** to conclude that the insurance contract
> must be reformed to include extended PIP benefits for pedestrians."  ***Id***.
> So, in order to define ***Brennan's*** "purpose," I look to the purposes of the
> rules ***Brennan*** applied:  the CAARA and ***Thompson***.

***Clark***, 292 F. Supp. 2d 1266.

The purpose of the CAARA is to avoid inadequate compensation to victims of

auto accidents.  ***Brennan***, 961 P.2d at 553.  Prompt compensation to victims of auto

accidents also is a purpose of the CAARA.  ***See, e.g., Allstate Ins. Co. v. Avis Rent-

A-Car System, Inc.***, 947 P.2d 341, 346 - 347 (Colo. 1997).  The general purpose of the

Colorado Court of Appeals' holding in ***Thompson*** is to reform policies that violate the

requirements of the CAARA to assure that the policy meets the statutory minimums.

***Thompson***, 940 P.2d at 990.

The mandate of ensuring prompt and adequate compensation to victims of auto

accidents augurs conceivably for an earlier reformation date.  Ensuring that insurance

coverage meets statutory minimums involves providing a deterrent for insurance

companies that fail to offer or provide coverage that meets statutory minimums.  An

earlier reformation date tends to be more expensive for the insurance company, and

thus tends to provide a deterrent and an incentive.  "That incentive works only where interpretations are predictable or foreshadowed."  **Clark**, 292 F. Supp. 2d at 1267.

In this case, two rules of the CAARA are involved.  First, the CAARA required that pedestrians be included in APIP coverage.  As discussed above, the development of this rule was somewhat unpredictable, but that unpredictability does not play a significant role in this case.  Prudential included pedestrians in its APIP coverage. Providing coverage to Fincher tends to serve the purpose of providing coverage to pedestrians.

Second, the CAARA required Prudential to offer APIP coverage to its potential insureds with a cap on APIP coverage no lower than 200,000 dollars.  There was no uncertainty or unpredictability about this rule.  Despite this requirement, Prudential offered of APIP coverage to Bekeshkas with a cap of 150,000 dollars.  Bekeshkas declined APIP coverage and was issued a policy that did not include APIP coverage. Prudential's policy form included a 150,000 dollar cap on APIP coverage if the insured selected that coverage.  This history of the 200,000 dollar cap requirement weighs in favor of a reformation date closer to the time of the accident because reformation at that time would tend to provide a disincentive to insurance companies that fail to comply with the clear and known requirements of the CAARA.

When Fincher asserted her claim for APIP coverage, Prudential denied the claim because APIP coverage was not included in the Bekeshkas policy.  After Fincher filed suit alleging that Prudential's offer of APIP coverage was defective, Prudential relied on its position that **Brennan** was not retroactive.  If **Brennan** was not retroactive, Prudentail argued, then its offer of APIP coverage was not defective as to a pedestrian

claimant because, at the time of the offer, Prudential was not required to include pedestrians in APIP coverage.  When *Clark II* was issued, Prudential first became aware that the rule in *Brennan* applied retroactively, defeating this standing argument.

On balance, I conclude that this factor weighs in favor of an earlier reformation date.  An earlier reformation date tends to ensure that Fincher receives all of the coverage to which she is entitled, and that she receives compensation for the fact that she did not receive that coverage in a timely fashion.  These are the key purposes of the CAARA, and the purposes of rules in *Brennan*, and *Thompson*.  The CAARA requirement violated by Prudential was established clearly at all times relevant to this case.  In contrast to *Clark II*, an earlier reformation date in this case will have the effect of deterring violation of the clear requirements of Colorado law.

**iii**.  The degree of injustice or hardship reformation
from a particular effective date would cause the parties.

Fincher argues that she will suffer a hardship if the court selects a later date of reformation because she will be denied the time value of the money she is due from Prudential.  She argues also that a later date of reformation would deprive her of the benefit of the key purpose of the CAARA –  prompt payment of benefits to the victim of an auto accident.  Reformation on the date of this order also would deprive Fincher of her ability to pursue other enforcement mechanisms that may be available to her, such as her breach of contract and insurance bad faith claims.

Prudential argues that an early reformation date would require it to process numerous claims retroactively , which would impose a great hardship on Prudential.  This consideration assumes that Fincher's date of reformation automatically will apply to other persons who assert similar claims for coverage under Prudential policies.  This

19

assumption is based on Fincher's pending request to certify a class of Prudential insureds who are situated similarly to Fincher.  To the extent such hardships might be considered relevant, I conclude that they do not weigh heavily in favor of a later reformation date.  Some testimony was presented about the procedures Prudential would have to undertake if it had to research past claims that might be similar to Fincher's.  While not necessarily inconsequential, I conclude that these procedures are within the ordinary ken of an insurance company and would not impose an overwhelming hardship on Prudential.  Further, even if I were to conclude that the Bekeshkas policy should be reformed as of the date of this order, such a conclusion would not necessarily preclude other similarly situated claimants from asserting claims against Prudential, requiring Prudential to research past claims.

At the moment, however, only Fincher's case and the Bekeshkas policy are before me.  Although Prudential may face some hardships if I order an early reformation date for the Bekeshkas policy, and then subsequently apply that analysis to other claimants, that possibility is not directly relevant to the equitable factors that must be considered in reforming the Bekeshkas policy.  Fincher's relief should not be limited because claims asserted by others might impose a burden on Prudential.  Thus, I do not consider the potential hardship of processing the claims of others as one of the relevant factors.

In addition, Prudential argues that Fincher will receive the same amount of benefits no matter what date of reformation is chosen.  It argues that Fincher's medical expenses in excess of the amounts paid by Prudential under the policy have been paid by her health insurance carrier.  This fact, Prudential argues, minimizes Fincher's loss

of the time value of money.  To some extent this may be true.  Still, Fincher has experienced long delay in receiving the benefits to which she is entitled, and that constitutes some level of hardship to Fincher.

In **Clark II**, Judge Babcock considered the hardship to an insurance company presented by unpredictable rules:

> Without having predicted the unforeseeable outcomes of **Brennan** and **Clark**, State Farm is left now without the ability to retroactively account for the liability to which it would be now exposed.  Consequently, a retroactive reformation date inequitably would hold State Farm liable for coverage it could not foresee during a time it reasonably did not know of such exposure.

**Clark II**, 292 F.Supp. 2d at 1267.

The circumstances in this case differ significantly.  Prudential chose to include pedestrians in APIP coverage, though many thought such coverage was not required by Colorado law.  APIP coverage for pedestrians under Prudential's policy presented no uncertainty because Prudential chose to include pedestrians in its APIP coverage.  Prudential knew also of the CAARA requirement that a cap on APIP coverage not be lower than 200,000 dollars, but Prudential included a lower cap in its offer and in its policy.  By no later than September, 1996, when the **Thomspon** opinion was issued, Prudential was aware that its defective offer of APIP coverage could subject it to reformation of its policy to provide APIP coverage.  Considering these circumstances, a retroactive reformation date would not inequitably hold Prudential liable for coverage it could not foresee, or an exposure about which it was not reasonably aware.

Although both parties face some hardships depending on the reformation date I choose, I conclude that the balance of these hardships weighs in favor of an earlier reformation date.

**iv**. Conclusion

On balance, each of the relevant factors weighs in favor of an earlier reformation date.  In contrast to **Clark II**, unpredictability of the relevant legal rules does not play a significant role in this case.  The primary purposes of the CAARA, adequate and timely compensation for victims of auto accidents, will be served by an earlier reformation date.  An earlier reformation date will tend to provide a deterrent for insurance companies that fail to comply with the clear requirements of Colorado law.  Because the relevant law was clear at all times, an early reformation date will not upset the past practices or reasonable reliance of Prudential.  To the extent Fincher relied on the relevant law, that reliance will be served by an earlier reformation date.

The one consideration that significantly weighs in favor of a later reformation date is the delays Prudential faced in getting its forms, rules, and rates approved by the CDOI.  Again, some of that delay is attributable to the CDOI.  Even if I attribute three of the first four years of that delay solely to the CDOI, Prudential still had more than a year before Fincher's accident to get its forms, rules, and rates in compliance with the requirements of Colorado law.  Although I do not conclude as a matter of fact or law that the delay should be allocated in this way, this example demonstrates that Prudential had ample opportunity to get its forms, rules, and rates in compliance with the law prior to the Fincher accident, but it failed to do so.

Even if one concludes that four years of delay in achieving compliance with the CAARA is reasonable, and I do not adopt that conclusion, reformation of the Bekeshkas policy as of the date of the Fincher accident, May 8, 1994, allows for more than four years for Prudential to have achieved compliance with the 200,000 dollar cap

22

requirement.  The considerations outlined by the Tenth Circuit, and the specific considerations outlined above, do not augur for a later date of reformation.  Therefore, I will order that the Bekeshkas policy be reformed as of the date of the accident, May 8, 1994.

### C.  Terms of Reformation - $200,000 Cap

Prudential's offer of APIP coverage is flawed because it provided for an impermissibly low cap on such coverage.  That impermissibly low cap must be written out of the policy, and the terms of the policy must be reformed to comply with the requirements of the CAARA.  Prudential argues that the reformed policy should include a 200,000 dollar cap on APIP benefits, as permitted by the CAARA.  In essence, Prudential notes that it always included a cap on APIP benefits in its policies, and that it applied the 200,000 dollar cap to its APIP policies after the permissible cap was raised to that level.

Fincher argues that the improper 150,000 dollar cap on APIP benefits must be stricken from the Prudential policy.  Further, Fincher argues that coverage in conformity with the CAARA must be incorporated into the policy.  As stated in §10-4-710(2)(a), C.R.S., APIP coverage provides compensation for medical expenses and work loss "without dollar or time limitation."  Section  §10-4-710(2)(b) provides for the permissible, but not mandatory, 200,000 dollar cap on such benefits.  Fincher argues that the court should remove the impermissible 150,000 dollar cap and nothing more.  With the removal of the cap, Fincher would be entitled to APIP benefits "without dollar or time limitation."  §10-4-710(2)(b).  Fincher asserts that it would not be proper for the court to provide an alternative cap that would be compliant with Colorado law.

In both **Brennan** and **Clark**, the flaw in the insurance companies' APIP offer was that pedestrians were not included in the APIP coverage.  Both the **Brennan** and **Clark** policies included the permissible 200,000 dollar cap on APIP benefits, and in both cases that cap was found to be applicable after the policies were reformed to include pedestrians in APIP coverage.  In contrast, the insured in **Thompson**  was not offered APIP coverage of any kind.  Absent an offer of APIP coverage, there obviously was no provision for a cap on APIP coverage in the offer or policy.  In **Thompson**, the Colorado Court of Appeals concluded that no cap would be applied to APIP coverage that was incorporated into the policy by operation of law.  "Budget could have included in its rental agreement a provision for a $200,000 cap for all benefits.  It did not do so, however, and therefore, plaintiffs' benefits are not subject to such a limitation."  **Thompson**, 940 P.2d at 991.

> "Generally, the purpose of reformation of an insurance contract is to make the policy express the true intent of the parties. However, when a policy is violative of a statute, reformation is also required to assure that coverage will meet the statutory minimums." **Thompson v. Budget Rent-A-Car Sys., Inc**., 940 P.2d 987, 990 (Colo. Ct. App.1996). The Colorado Court of Appeals held in **Brennan** that "when ··· an insurer fails to offer the insured optional coverage that satisfied [CAARA], additional coverage in conformity with the offer mandated by statute will be incorporated into the policy." 961 P.2d at 554.

**Clark III**, 433 F.3d at 710.

In resolving this issue, I first must ensure that the policy is reformed to meet the statutory minimums.  Secondarily, I must consider the intent of the parties.  Third, because reformation is an equitable remedy, I find that I should consider equitable factors similar to those relevant to determining the date of reformation.  Those factors are 1) the degree to which reformation with or without a cap on APIP benefits would

upset past practices on which the parties may have relied, and whether Prudential anticipated the applicability of the 200,000 dollar cap; 2) how reformation with or without a cap would further or retard the purposes of the CAARA; and 3) the degree of injustice or hardship reformation with or without a cap would cause the parties.

Reforming the Bekeshkas policy to include APIP coverage will cause the policy to meet the applicable statutory minimums.  APIP coverage with a cap of 200,000 dollars is permitted under the applicable statute, so a reformation that includes this cap meets the statutory minimum.  It must be noted, however, that unlimited benefits are permitted by the statute, and the cap is optional.  The evidence presented at trial demonstrates clearly that Prudential always intended to impose a cap on its APIP coverage.  Bekeshkas declined to purchase APIP coverage based on a legally deficient offer of such coverage.  Under ***Thompson***, Bekeshkas' intent is not relevant.  940 P.2d at 990.  Fincher did not purchase APIP coverage from Prudential, and her intent is not relevant to this particular factor.  I now will examine the equitable factors.

**i**.  The degree to which reformation with or without a cap on
APIP benefits would upset past practices on which the parties
may have relied, and whether Prudential anticipated the
applicability of the 200,000 dollar cap.

As discussed above, Prudential certainly anticipated the applicability of the 200,000 dollar cap, and made significant but slow efforts to formally implement this minimum cap.  Prudential always included a cap on APIP benefits, and applied the 200,000 dollar cap to its APIP policies after that cap became effective, even though Prudential's forms did not provide for such a cap for about five years after the 200,000 dollar minimum cap became effective.  In short, the evidence in the record demonstrates that Prudential relied on the applicability of a cap on APIP benefits,

25

though it was less than vigilant in ensuring that its forms reflected the proper cap after the law changed.

There is no evidence that Fincher specifically relied on the applicable amount of any cap on APIP benefits prior to her accident.  After the accident, Fincher obviously relied on Bekeshkas' insurance coverage as a source of compensation for her injuries, but she could not have placed any reliance on the fact that Bekeshkas carried anything more than the legally mandated level of coverage, which did not include APIP coverage.  Again, it is fair to conclude that Fincher reasonably relied on Prudential, and insurance companies generally, to comply with applicable law in offering and providing the coverage available to her under the Bekeshkas policy.

This factor weighs in favor of imposing a 200,000 cap on APIP benefits under the reformed Bekeshkas policy.  Prudential relied consistently on the certainty of a cap on APIP benefits.  Though Prudential's procedures in formally enacting that cap were less than perfect, Prudential consistently made an effort to include a cap on APIP benefits, evidencing an intent to include such a cap.  On the other hand, though Fincher can be seen as having relied on an insurance company's obligation to comply with the law, there is no evidence that she placed any specific reliance on the availability of APIP coverage.  In terms of Fincher's reliance of the CAARA, providing her with unlimited APIP coverage would provide her with an unreasonable windfall.

**ii**.  How reformation with or without a cap would
further or retard the purposes of the CAARA.

Again, the key purpose of the CAARA is to avoid inadequate compensation to victims of auto accidents.  ***Brennan***, 961 P.2d at 553.  The general purpose of the holdings in ***Thompson***, ***Brennan***, and ***Clark*** is to reform policies that violate the

requirements of the CAARA to assure that the policy meets the statutory minimums. *Thompson*, 940 P.2d at 990.

Obviously, if no cap is applied to the Bekeshkas policy, Fincher will have a larger recovery under the policy.  A larger recovery can be seen as providing more adequate compensation to Fincher, a victim of an auto accident.  However, it should be noted also that the CAARA made APIP coverage optional, and permitted a 200,000 dollar cap on such coverage.  This indicates that, for the purpose of the CAARA, APIP coverage of 200,000 dollars is considered to be adequate.  In short, the imposition of  a cap does not make APIP coverage inadequate.

Another purpose of the CAARA is to require insurance companies to comply with its provisions.  In terms of offering APIP coverage with a permissible cap, Prudential was non-compliant for a substantial period of time.  However, as discussed above, Prudential consistently provided a cap on its APIP coverage, although its implementation of the 200,000 dollar cap beginning in 1990 was flawed.  Reforming the policy to provide no cap would penalize Prudential.  Such a penalty would tend to serve the purposes of the CAARA by encouraging compliance.  I note, however, that Prudential also faces other potential penalties, such as an earlier reformation date and Fincher's breach of contract and bad faith breach of insurance contract claims.

On balance, I conclude that this factor weighs in favor of including a 200,000 dollar cap on APIP benefits under the Bekeshkas policy.  A cap at this level explicitly is permitted by the CAARA, and thus providing APIP benefits at this level must be seen as providing adequate coverage under the CAARA.  To the extent to which Prudential should be further penalized for its violation of the CAARA, that penalty is more

appropriately determined via other means, most notably Fincher's bad faith breach of insurance contract claim.

### iii. The degree of injustice or hardship reformation with or without a cap would cause the parties.

If the policy were reformed to make Fincher's APIP benefits unlimited in time and amount, then Prudential would suffer the hardship of liability for medical expenses, and possibly wage loss, for the balance of Fincher's life.  In light of Fincher's permanent injuries, those expenses likely will be great.  Under the circumstances outlined in this order, I conclude that Prudential readily could anticipate exposure to APIP claims rising to the level of the permissible cap of 200,000 dollars.  However, Prudential had little if any basis to anticipate exposure to unlimited APIP claims, given its assiduous efforts to always apply a cap to such benefits.  Absent significant countervailing considerations, exposing Prudential to an unanticipated and unlimited liability would be inequitable.

Fincher faces tragic injustice and hardship because of her injuries.  Unlimited compensation from Prudential likely would minimize that hardship to some extent.  In this context, however, the extent to which money might minimize Fincher's hardships is not a compelling consideration.  I conclude that the key consideration is any injustice Fincher might suffer if the APIP benefits available to her are capped at 200,000 dollars.  Again, Fincher did not rely on any particular term of the Prudential policy prior to the accident, but I conclude that she relied generally on Prudential's compliance with the law once she became a Prudential insured by virtue of her accident.  Prudential did not fully comply with the CAARA, and thus denied Fincher benefits for several years.  Had Bekeshkas chosen to purchase APIP coverage, or had Prudential treated its policy as having been reformed to provide APIP benefits after Fincher's accident, Prudential

would have provided Fincher 200,000 dollars in APIP benefits.  There is no basis to conclude that Prudential would have provided more.

Considering all of the circumstances of this case, I conclude that providing Fincher with 200,000 dollars in APIP benefits reasonably balances the relevant hardships and injustices to both Prudential and Fincher.

<strong>iv</strong>. Conclusion.

On balance, I find that the relevant equitable factors weigh in favor of including a 200,000 dollar cap on APIP benefits under the Bekeshkas policy.  Including this cap protects the parties' reasonable reliance and past practices, serves the purposes of the CAARA, and balances the relevant injustices and hardships between the parties. Reforming the policy with no cap would substantially upset Prudential's reliance on its ability to limit and control the liabilities to which it was exposed, and would provide an inequitable windfall to Fincher.  Further, including a cap on APIP coverage provides the coverage mandated by the CAARA, and respects Prudential's pellucid intent to include such a cap in its policy.

<strong>IV.  ORDERS</strong>

**THEREFORE, IT IS ORDERED** as follows:

1.  That plaintiff Kelly Fincher's claim for reformation of the Prudential policy is **RESOLVED** by the court's reformation of the Prudential policy under the terms outlined below;

2.  That the Prudential policy under which Fincher is entitled to benefits is **REFORMED** to provide APIP benefits as of the date of Fincher's accident on May 8, 1994;

3.  That the Prudential policy is **REFORMED** to include the permissible cap on APIP benefits of 200,000 dollars;

4.  That on or before **March 13, 2006**, the parties shall file a status report outlining the proceedings they feel are necessary to prepare Fincher's remaining claims for trial, including a description of any additional discovery that may be necessary to prepare those claims for trial; and

5.  That on **March 15, 2006, at 9:30 a.m.**, the parties shall call my administrative assistant, Susan Schmitz, at 303-335-2353 to obtain a trial setting for Fincher's remaining claims.

Dated February 28, 2006, at Denver, Colorado.

BY THE COURT:

s/ Robert E. Blackburn
**Robert E. Blackburn**
**United States District Judge**